UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| KENNETH FIXLER, | ) | |
| | ) | Chapter 7 |
| Debtor. | ) | |
| _____ | ) | Case No. 19-36659 |
| | ) | Honorable A. Benjamin Goldgar |
| BCL-HOME REHAB LLC, | ) | Lake County |
| | ) | |
| Plaintiff, | ) | Adversary Case No. _____ |
| | ) | |
| v. | ) | |
| | ) | |
| KENNETH FIXLER, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

### ADVERSARY COMPLAINT OBJECTING TO
### DISCHARGEABILITY OF DEBT OWED TO BCL-HOME REHAB LLC

BCL-HOME REHAB LLC ("*Home Rehab*" or "*Plaintiff*") by and through its attorneys, Levenfeld Pearlstein, LLC, files this Adversary Complaint objecting to the dischargeability of debt owed to BCL pursuant to 11 U.S.C. §§523(a)(2)(A) and 523(a)(4). In support of its Adversary Complaint, BCL states as follows:

### PRELIMINARY STATEMENT

Debtor, Kenneth Fixler, was the President of Barnett Homes, the operating name for Home Rehab. Fixler is also a minority interest-holder in Home Rehab. As President, Fixler was entrusted with hundreds of millions of dollars to effectuate the business plan that he had proposed and sold to the other members of Home Rehab. But Fixler committed defalcation while acting as a fiduciary to those members and to Home Rehab by, among other things, carelessly overreaching in his acquisitions, staffing up Home Rehab as his personal fiefdom into which he

hired his family, failing to meet construction and sale timelines, carrying properties and staff for multiple years longer than planned and promised, and causing massive losses across the portfolio. Put simply, Fixler took advantage of trust built up over a long personal and family relationship to recklessly gamble with what he treated as "house money," all the while promising his partners that he was "at risk" with them, only to walk away when called upon to pay back his share of the massive losses that he personally caused.

## JURISDICTION AND VENUE

1. This adversary proceeding is a civil proceeding arising under the Bankruptcy Code or arising in or related to a case under the Bankruptcy Code within the meaning of 28 U.S.C. § 1334(b).

2. The court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334, and internal operating procedure 15(a) of the Federal District Court of the Northern District of Illinois.

3. This is a core proceeding under 28 U.S.C. § 157.

4. Venue of this adversary proceeding is proper in this Court under 28 U.S.C. § 1409 (a) and Rule 312 of the Bankruptcy Rules for the U.S. District Court and the U.S. Bankruptcy Court for the Northern District of Illinois.

## THE PARTIES

5. Home Rehab is an Illinois limited liability company formed under the law of Illinois. Home Rehab's principal place of business is in Northbrook, Illinois.

6. Defendant, Kenneth Fixler, ("*Fixler*") maintains a residence in Riverwoods, Illinois and is a resident of the State of Illinois.

## ALLEGATIONS COMMON TO ALL COUNTS

*Fixler's History and Relationship with BCL and the Barnett Family*

7. Barnett Capital Ltd. ("**BCL**"), Home Rehab's affiliated parent company, is the real estate platform of the Barnett family office. BCL has been in business for over thirty (30) years and specializes in, among other things, providing capital to entrepreneurs and businesses that do not have access to conventional capital at scale to allow them to seize market opportunities quickly.

8. Joel Barnett ("**Barnett**") is the Chairman and President of Barnett Capital.

9. Barnett and Fixler have had a relationship for decades. In fact, they are family, as their wives are first cousins.

10. Fixler has been in the real estate industry since the mid-1990's, when he first began working with Tucker Development, eventually holding the role of vice president of leasing and retail development.

11. After leaving Tucker Development in the early 2000's, Fixler started his own company, Axis Properties, LLC ("**Axis**"), which was in the same industry of real estate development as Tucker Development, albeit on a smaller scale.

12. During this time period, Fixler rented office space for Axis from BCL at BCL's headquarters in Northbrook, Illinois.

*Fixler's Interest in and Responsibilities With Respect to Home Rehab*

13. In or about 2009, Fixler started working for Home Rehab, which was then in the business of buying low-value foreclosed single-family homes, rehabbing them, and reselling them for a profit.

14. Fixler was responsible for finding and acquiring the properties, overseeing the construction, and overseeing the sale of the properties.

15. Like all BCL-related entities, Home Rehab was funded through loans from another BCL related entity – BCL-Operations LLC ("*Operations*"). Operations would loan the funds necessary for Home Rehab to acquire and rehab the homes and to pay overhead and other SG&A and capital costs, and Operations was repaid with revenue generated from the sale of those "flipped" homes at a profit.

16. Ultimately, by 2010, Fixler acceded to the presidency of Home Rehab and assumed responsibility for all of its operations, and Fixler requested and was offered an ownership stake in Home Rehab. Due to his family relationship, Fixler was able to negotiate a 20% membership stake – the highest non-Barnett membership percentage.

17. Fixler was not required to affirmatively pay for his 20% membership interest in Home Rehab. Rather, Fixler personally guaranteed his portion of the funds loaned to Home Rehab by Operations. Fixler himself did not "pay-in" his capital stake using personal funds initially or at any time as the business grew and required more capital.

18. Thus, as a result of Fixler's 20% ownership interest in Home Rehab, in addition to his entitlement to a pro rata distribution of his share of any profits, he also guaranteed the repayment of his pro rata percentage of any losses that Operations might incur should Home Rehab fail to make sufficient profit on the home sales to satisfy the Operations operating loans or any third party loans that Operations may incur on Home Rehab's behalf.

19. Fixler represented to Barnett and the other members of Home Rehab that he had sufficient personal and family means to take on the potential risk associated with such an ownership interest in Home Rehab.

20. Home Rehab operated under BCL's decentralized structure, which allowed it to operate under its own business line head – here, Fixler, who was the President – with periodic updates to and strategic consultation with Home Rehab's other members.

21. As President, Fixler was responsible for running all of the business of Home Rehab – finding the properties, overseeing the staff and the construction, and arranging for and overseeing the sale of the properties.

22. From 2009 through 2013, Operations invested approximately $15 million in Home Rehab, which in turn flipped and sold approximately 150 homes, generating profits for its members during that time period of approximately $5 million, of which Fixler was entitled to and was provided his 20% share of approximately $1 million in profit distributions.

*Plaintiff's Business Shifts to Luxury Home Market Under Direction of Fixler*

23. During the first quarter of 2014, despite Home Rehab's profitability, Fixler expressed dissatisfaction with his total take-home from the profits and told the other members that he wanted to expand Home Rehab's business aggressively to increase profits both overall and to himself.

24. After the first quarter of 2014, Fixler, at a meeting with Home Rehab's other members, lead a strategic discussion revolving around moving Home Rehab into the luxury home market (with purchase prices in the mid-/high- six figures and sale prices over seven figures), in which he would seek projects with gross margins of 13-18% and leveraged annualized returns to investment capital of 24%-35%.

25. Fixler's business plan was based upon his premise that he could cause Home Rehab to complete the rehab of existing homes in a nine- to twelve-month timeframe and tear

down and rebuild new homes in a twelve- to fifteen-month timeframe per home. *See* "Barnett Homes Sample Standard Timelines," prepared by Fixler, attached as **Exhibit 1**.

26. Fixler also wanted to bring general contracting "in-house" to increase gross margins for Home Rehab by cutting out a general contractor, but also thereby greatly increasing his staff and overhead.

27. Given Fixler's representations and the business plan that he dictated, not to mention his family relationship and success with the low-end rehab projects, BCL agreed to (i) cause Operations to continue to make additional loans to Home Rehab to provide Home Rehab with the operating liquidity that Fixler would need to implement his business plan for Home Rehab to move out of low-end and into the luxury market, (ii) hire an extensive staff for Fixler's in-house contracting, and (iii) procure outside, third-party financing on the order of 70% loan-to-cost to allow Fixler to continue to grow and achieve his promised leveraged returns.

28. As he had for the years prior, Fixler continued as President of Home Rehab, solely responsible for the business operations and success of Home Rehab – finding the opportunities, finding the properties, staffing the company, overseeing the construction staff and subcontractors, and arranging for and overseeing the sale of the properties.

*Fixler Kicks Off Home Rehab's Buying Spree*

29. Under Fixler's leadership and direction as President, starting after the first quarter of 2014, Home Rehab embarked on the new business plan focused on the luxury home market under the name of "Barnett Homes." Fixler caused Home Rehab to begin acquiring properties at a rapid clip.

30. As the President of Barnett Homes, Fixler was the only member of Home Rehab who was involved in the day-to-day business operations. He remained in sole control of the

6

decisions regarding what properties to buy, as well as the design, implementation, and timeline of the projects. And Fixler was solely responsible for visiting the properties and ensuring that the projects remained on track.

31. In his role as President of Barnett Homes, Fixler necessarily possessed far more knowledge and understanding of the "boots on the ground" performance of Barnett Homes than did the other members of Home Rehab. As such, Fixler was also responsible for creating and maintaining documents reflecting the current status of the portfolio of projects, including up-to-date projections as to cost and timeline for completion of construction, sale timing and price, and projected profits for each and every property. *See* spreadsheet of portfolio, dated March 23, 2015, created by Fixler and his staff, attached as **Exhibit 2**, to track all of this information.

32. During the approximately 12 months starting around the end of the first quarter of 2014 and ending around the end of the first quarter of 2015, BCL caused Operations to fund operations and hire requested staff and employees, as promised. And BCL arranged for the promised third-party financing, first from Dwell Finance and later from Private Bank and Heartland Bank. This third-party financing required personal guarantees backed by Joel and Nancy Barnett and certain trust accounts of their children containing substantially all of the assets of the family.

33. And during this 12-month period, using the funding and commitments provided by Operations and third-party lenders procured by BCL, Fixler purchased seventy-four (74) homes for over forty million dollars ($40 million). That sum represented more than two and one-half times (2.5x) the dollar value of inventory that Home Rehab had purchased in total in its prior five-year operating history. *See* Exhibit 2.

7

34. Of those homes, there were fifteen (15) properties that Fixler planned to sell for over two million dollars ($2 million) each, representing a grossly disproportionate share of the market for homes in that price range in the Chicagoland area at that time, a fact that Fixler knew or should have known. See Exhibit 2.

35. In or around the fall of 2015, the other members of Home Rehab became concerned about the pace of acquisitions that Fixler was driving, and a meeting was held to discuss these concerns and to check in on the business plan. In particular, the matter of the numerous homes to be sold at price points in excess of $2 million was discussed.

36. At that meeting, Fixler was insistent that his business plan was good and that the pace of Home Rehab's acquisitions was in line with the sales that he as President of Barnett Homes could achieve. Fixler stated that he was confident that the acquired properties would have the ability to create the expected profits set forth in his business plan – going so far as pounding his fist on the table to make his point.

37. Because of the family relationship, and because Fixler also had "skin in the game" as a result of his 20% membership interest in and guarantee to Home Rehab, the other members were reassured that Fixler had all of their best interests in mind with respect to Home Rehab's business plan.

38. As a result of Fixler's reassurances regarding his ability to faithfully execute his business plan and his projections reflecting great profitability for Barnett Homes, Home Rehab was provided continued access to nearly unlimited resources from Operations, Private Bank, and Heartland Bank for Fixler to perform as promised.

***Fixler is Unable to Keep Home Rehab on Schedule and His Reckless Actions Cause Losses to Become Inevitable and Substantial***

39. Throughout the course of 2015 and into 2016, even as he continued to acquire additional properties, Fixler was unable to keep Barnett Homes on schedule for properties already acquired and projects already underway.

40. While his business plan and projections called for an eight- to fifteen-month timeline from acquisition through construction and to disposition, the reality was far different. By early 2016, Fixler knew or should have known that the average holding time for the Barnett Homes properties was or was going to be at least two years and often even more.

41. Needless to say, such a substantial increase in turnaround time would, and did, correspondingly create a substantial increase in carrying costs across the portfolio.

42. Upon information and belief, by early 2016, Fixler knew or should have known that Home Rehab was going to incur losses on the whole portfolio of properties that it held. Nonetheless, as of February 2016, Fixler continued to represent to the other members of Home Rehab, and to the outside lenders, that Home Rehab would turn a $12 million profit on the homes to be sold through the end of 2016, which represented approximately 60% of the total portfolio. *See* **Exhibit 3**, spreadsheet created by Fixler, showing estimated projections through end of 2016.

43. Through most of 2016, Fixler continued to hide from Home Rehab's members that he had failed to manage Barnett Homes' construction schedule or properly estimate or account for carrying costs, and that Home Rehab was expecting losses that year rather than profits.

*Fixler Finally Comes Clean*

44. In or around September 2016, Fixler finally admitted to Home Rehab's other members that the expected profits he had promised to them and presented to the banks would not be forthcoming, and that the Home Rehab portfolio was instead running at a loss.

45. At the time of this bombshell of a disclosure, Fixler projected that Home Rehab's losses would total just over four million dollars ($4 million) and assured the other members that he would be able to effectuate a "soft landing" for Home Rehab. See updated spreadsheet, created by Fixler, dated September 30, 2016, attached as **Exhibit 4**.

46. This constituted a swing of over sixteen million dollars ($16 million) and belies the validity and accuracy of the statements and reassurances made by Fixler just months earlier regarding expected profitability of the portfolio. Upon information and belief, this is merely further evidence that Fixler knew or should have known that the statements made to Home Rehab's members and outside lenders were simply false.

47. Immediately upon Fixler's disclosure of Home Rehab's losses, the other members determined that they had an obligation under the operative operating agreement to pay in capital to cover the funds previously fronted by Operations, which they had anticipated would be repaid with funds from the previously-expected profitable operations of Home Rehab.

48. Therefore, in or around September 2016, the members of Home Rehab collectively paid in $3,637,179 to cover the losses for 2015 and the first half of 2016. Fixler paid his pro rata 20% and contributed $727,435.00.

49. On or about January 1, 2017, Fixler, together with Home Rehab's other members, executed a Second Amended and Restated Operating Agreement ("**Second Amend. Op. Agt.**") for Home Rehab (attached as **Exhibit 5**). Notably, because of Home Rehab's 2016 losses, the

Second Amend. Op. Agt. expressly called out and set forth the members' guarantee obligations with respect to funds loaned to Home Rehab by either Operations or the third-party lenders. Specifically, section 5.3 of the Second Amend. Op. Agt. states:

> <u>Guaranty Capital Contributions</u>. The Members hereby acknowledge that BCL-Operations LLC ("BCL-Operations") has prior to the date of this Agreement and may subsequent to the date of this Agreement make loans to the Company. Each of the Members hereby acknowledges that such Member agreed to reimburse an amount equal to its portion of such loans to the extent that upon the conclusion of the activities of the Company, the Company is not able to pay to BCL-Operations all of the outstanding principal and accrued but unpaid interest under such loans, as determined by the Members holding a majority of the Profit Percentages at such time, which amount shall be known as the "Guaranteed Amount." To the extent that BCL-Operations is required to pay any amount to another third party in respect of a loan from such other third party to the Company that BCL-Operations guaranteed, such amount shall increase the amount of the Guaranteed Amount accordingly. Upon determination by the Members holding a majority of the Profit Percentages at such time that the activities of the Company have concluded, a final calculation shall be performed by the Company to determine the amount of the Guaranteed Amount. Within 10 days of such determination (or later upon determination by the Members holding a majority of the Profit Percentages at such time), the Members shall contribute to the Company in an amount equal to the Guaranteed Amount multiplied by such Member's Profit Percentage, which amounts the Company shall pay to BCL-Operations. For the avoidance of doubt, and notwithstanding the foregoing, the Guaranteed Amount shall not include, and no Member shall be required to contribute pursuant to this Section, any amount in duplication of amounts paid by such Members in respect of the Pay In Amount.

50. On or about March 15, 2017, Home Rehab's members determined that it was necessary to make the next contribution of approximately $4 million to cover losses from the sale of the few homes that Fixler was able to finish and sell in the last half of 2016.

51. Fixler dragged his feet on paying in this amount, but ultimately paid his 20% share of this contribution in two parts: $510,000 on or about June 6, 2017 and $290,000 on or about June 21, 2017.

### *Fixler Uses BCL and Home Rehab to Provide Employment and Substantial Income to His Son and Daughter-in-Law*

52. During this same period of time, likely already knowing that Home Rehab was going to incur substantial losses, Fixler was still able to secure a job for his son, Jonathon Fixler, as Vice President of Barnett Homes. Upon information and belief, this was Jonathon's first job in real estate or business – prior to being hired by Fixler, Jonathon had spent a few years after college playing professional baseball.

53. In addition, Fixler caused Home Rehab to retain Jonathon's wife, Fixler's daughter-in-law, Chris Fixler, as Home Rehab's real estate broker for the sale of its properties. At the time that Fixler hired Chris, upon information and belief, she was only a few years out of college, with less than three years' experience in real estate. Yet Fixler entrusted Chris with an extensive portfolio of properties on which Home Rehab had expended over a hundred million dollars to purchase and rehab, and for which Home Rehab would need to rely on successful sales in order to generate profits.

54. Notably, even if Home Rehab were to lose money (which it did), Chris, as the broker, stood to make (and did make) millions of dollars on the sale of the Barnett Homes properties. Indeed, upon information and belief, the sale of Barnett Homes properties generated over five million dollars in commissions payable to Chris Fixler.

### *Fixler Recklessly Doubles Down*

55. Despite his personal guarantee, and despite promises of soft landings, over the course of 2017, Fixler failed to act reasonably to quickly complete and liquidate the portfolio.

12

56. Rather, Fixler continued to cause Barnett Homes to miss completion targets and deadlines and continued to cause Home Rehab to incur inflated carrying costs and losses on the homes.

57. Upon information and belief, in 2017 there were also homes that Fixler rebuilt multiple times, at great cost, because he could not settle on a design that he liked.

58. For all of these costs and expenses, Fixler continued to draw on the funds provided to Home Rehab by Operations and Private Bank, recklessly increasing the obligations that would need to be repaid by Home Rehab and all of its members.

59. During this time, Jonathon remained employed, and Chris continued to earn millions of dollars in commissions from sale of the properties.

60. Come January 1, 2018, Home Rehab's members again were obligated to make another contribution, this time in the amount of $8,664,806, to cover losses from the homes sold in 2017.

61. This time, Fixler failed to pay his entire contribution when it came due. Instead, Fixler paid only $300,000 on or about March 20, 2018.

62. Leaning on his Barnett family connection, Fixler went to Barnett to discuss his short-term liquidity situation. Fixler explained that the family money was there, through his father, to ensure that Fixler would be able to satisfy all of his obligations to Home Rehab, but he needed short term help until he could get the requisite funds from his father.

63. Counting on these promises, Barnett and his wife (Fixler's wife's cousin), agreed to help Fixler obtain a mortgage by co-signing for him. With Joel and Nancy Barnett's help and personal guarantee, Fixler was able to take out a mortgage on his house. On July 27, 2018. Fixler

13

then paid the $441,272.39 in mortgage proceeds to partially pay down the outstanding contributions that he owed to Home Rehab for the 2017 losses.

64. Also citing to his liquidity issue, Fixler asked Barnett if he could draw against capital in Home Rehab for living expenses while he turned the business around.

65. Again, given the family relationship, Fixler's family's independent wealth, and Fixler's continued promises regarding his ability to get the funds from his father with more time either through funds Fixler received during his father's lifetime or with his later inheritance, Barnett agreed to the request for monthly draws. Fixler was then provided with $15k monthly draws from April 2018 through May 2019, totaling $195k.

66. On information and belief, Fixler took these draws despite knowing that he had no intention of repaying the draws or his remaining portion of Home Rehab's losses.

67. Fixler remained in his role as President of Barnett Homes, and he continued to miss deadlines and his own projections.

68. Home Rehab had every reason to believe that Fixler was exercising his fiduciary duties and making good use of the funds that Home Rehab had borrowed – he was himself personally obligated for losses.

69. Yet, as a result of Fixler's unwillingness or inability to take any reasonable action to timely complete the projects and dispose of the properties, the losses continued to build over 2018.

70. By April 2019, Home Rehab's members were required to make an additional contribution of approximately $10 million to cover 2018 losses.

71. Fixler did not pay anything toward the April 2019 contribution demand or any contributions demanded or made by the other members of Home Rehab thereafter.

14

72. But Fixler did continue to make statements that he was working to pull together the funds from family or other sources and that he would never walk away from his Home Rehab guarantee obligations and would never leave Barnett, his family, "holding the bag."

73. Notwithstanding these representations, on May 13, 2019, Fixler met with Barnett and informed him that he would not be paying anything toward the debt that he owed to Home Rehab. Fixler then left Barnett's office and has not returned since.

74. By mid-2019, the total losses on the entire Barnett Homes portfolio were approaching thirty million dollars ($30 million), and by the time the portfolio had been completely liquidated, the total losses were $30,947,721.60. See attached summary profit and loss statement for Barnett Homes portfolio, attached as **Exhibit 6**. Fixler's 20% share of those losses totals $6,189,544.32, of which $3,920,836.93 remains outstanding and unpaid.

*Fixler's Continued Actions to Harm Barnett and Home Rehab*

75. Upon information and belief, Fixler has not been employed, nor sought employment, since May 2019, thereby effectively preventing him from even trying to make good on his obligations to Home Rehab.

76. Upon information and belief, Fixler receives a monthly allowance from his father, paid to Fixler's wife, to cover their living expenses.

77. Notably, Fixler does not use this monthly allowance to pay his mortgage payment (which he convinced Barnett and his wife to personally guarantee, and which is now in default), but he does use the money from his father to pay his monthly country club dues of approximately $1500 to Lake Shore Country Club.

78. Upon information and belief, Fixler has also granted his father a second mortgage on his home.

15

### *Lawsuits and Warranty Claims Caused by Subpar Work on Fixler Projects*

79. Beyond the substantial losses that Home Rehab incurred as a result of Fixler's reckless treatment of the portfolio and the funds with which he was entrusted, Fixler's actions have also caused third-party claims and litigation to be filed against Home Rehab.

80. Upon information and belief, as a general matter, Fixler caused Barnett Homes to hire contractors and superintendents that were unqualified and lacked appropriate construction knowledge or expertise.

81. Fixler's hiring of subpar and unqualified contractors and superintendents resulted in faulty workmanship at the projects, which in turn has resulted in lawsuits being filed against Home Rehab.

82. For example, Luis and Christina Bowers, the owners of 3817 N. Wayne, Chicago, Illinois, a Fixler-led Barnett Homes project, filed a lawsuit against Home Rehab, among others (including Barnett), which is presently pending in the Circuit Court of Cook County, Case Number 19 CH 11018 (the "***Bowers Lawsuit***"), which includes allegations of mold and water infiltration at their property caused by faulty construction.

83. In the Bowers Lawsuit, the Bowers allege that they met and discussed the mold and water infiltration issues with Fixler multiple times with no resolution.

84. In addition to the lawsuits filed as a result of faulty construction at Fixler's properties, Home Rehab has also been forced to pay out approximately $2.5 million in warranty claims relating to faulty construction claims.

85. Home Rehab continues to receive additional warranty claims as a result of faulty construction caused by Fixler's hiring of subpar and unqualified contractors and his lack of proper oversight of those contractors or superintendents, among other things.

16

### *Home Rehab has Continued to Accrue Additional Losses Post-Petition*

86. Home Rehab is only able to calculate its losses for a given year at the conclusion of that year when the books are closed.

87. Fixler filed his petition for relief under the Bankruptcy Code on December 31, 2019. In the nearly two years since the Petition Date, Home Rehab has incurred additional losses of $5,101,905.10 for 2019, $1,606,647.70 for 2020, and $269,968.44 for 2021, totaling $6,978,521.24.

88. Fixler's share of those 2019, 2020, and 2021 losses totals $1,395,704.25, which constitutes a postpetition obligation.

### **COUNT I- OBJECTION TO DISCHARGEABILITY**
### **(11 U.S.C. § 523 (A)(2)(A))**

89. Home Rehab re-allege paragraphs 1-87 of this Adversary Complaint as though fully set forth herein.

90. Section 523(a)(2)(A) of the Bankruptcy Code provides that a debtor shall not be discharged from any debt "… to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."

91. In order to induce Home Rehab to continue to allow him to hold and maintain his position as President of Barnett Homes and to manage its business operations and construction activities (including, on information and belief, but not limited to, to allow his daughter-in-law to continue to sell the properties to earn commissions), Fixler grossly and fraudulently misrepresented the construction and sale timelines and overall profit projections of Home Rehab.

92. In reliance on these false representations, Home Rehab allowed Fixler to remain at the helm while continuing to incur debt and suffer financial losses as a result of Fixler's actions (or inaction) with respect to the construction of Barnett Homes' properties.

93. Home Rehab would not have continued to allow Fixler to acquire and rehab properties, leading to massive losses, in the absence of the false representations made by Fixler.

94. Similarly, Fixler falsely represented that he would not walk away from his obligations to Home Rehab, and in reliance on those representations he was permitted to take monthly draws on the line carrying his capital contributions in the amount of $15,000 per month, for a total of $195,000 in draws.

95. Given the long-standing and family relationships in play, Home Rehab reasonably and justifiably relied upon the false representations made by Fixler, who was the President of Barnett Homes at all relevant times herein.

96. Home Rehab has suffered damages as a result of the various false representations made by Fixler and his failure to repay the obligations that accrued as a result of those false representations.

*WHEREFORE*, Home Rehab respectively requests that this Court enter a judgment against Fixler as follows:

A. Denying discharge of Fixler's debt to Home Rehab pursuant to 11 U.S.C. § 523(a)(2)(A); and

B. Granting any other such relief as this Court deems equitable and just.

## COUNT II- OBJECTION TO DISCHARGEABILITY
### (11 U.S.C. § 523 (A)(4))

97. Plaintiffs re-allege paragraphs 1-87 of this Adversary Complaint as though fully set forth herein.

98. Section 523(a)(4) of the Bankruptcy Code provides that a debtor shall not be discharged from any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."

99. At all relevant times herein, Fixler, as a member of Home Rehab and the President of Barnett Homes, owed Home Rehab a fiduciary duty and was acting in a fiduciary capacity as the President of Barnett Homes.

100. In his role as President of Barnett Homes, Fixler was the only member of Home Rehab who was involved in and with knowledge of the day-to-day business operations and construction activities of Barnett Homes.

101. In his role as President of Barnett Homes and member of Home Rehab, Fixler had a fiduciary obligation to use and account for the funds provided to Home Rehab in a reasonable manner to achieve the business plan and profits that he presented to Home Rehab.

102. Fixler committed defalcation while acting in his fiduciary capacity by (i) grossly overstating Plaintiff's expected profits, (ii) holding properties for excessively lengthy periods of time before even beginning construction, (iii) causing Plaintiff to incur massive holding costs, (iv) not completing construction in a timely fashion, (v) using an inexperienced and unqualified broker (his daughter-in-law) to sell the properties, and (vi) recklessly and cavalierly incurring substantial debt for Home Rehab, without sufficient means to even repay his 20% share of the losses.

103. In addition to causing Home Rehab substantial damage, Fixler's reckless actions allowed him to remain in his role as President of Barnett Homes, to help generate income for his son and daughter-in-law, to draw $195k out of Home Rehab for his individual personal benefit, and to saddle a personal guarantee on Barnett and his wife for Fixler's home mortgage payments (which Fixler presently appears to be selectively not paying in favor of his country club dues).

104. Home Rehab has suffered damages as a result of the defalcation committed by Fixler in his fiduciary capacity.

105. Fixler has failed to repay Home Rehab for the debt obligation that he owes to Home Rehab as a result of the losses incurred as a result of Fixler's defalcation.

**WHEREFORE**, Home Rehab respectively requests that this Court enter a judgment against Fixler as follows:

A. Denying discharge of Fixler's debt to Home Rehab pursuant to 11 U.S.C. § 523(a)(4); and

B. Granting any other such relief as this Court deems equitable and just.

Dated: November 5, 2021

Respectfully submitted,

/s/ Elizabeth B. Vandesteeg
Elizabeth B. Vandesteeg (ARDC 6291426)
(evandesteeg@lplegal.com)
Jamie L. Burns (ARDC 6300120)
(jburns@lplegal.com)
LEVENFELD PEARLSTEIN, LLC
2 N. LaSalle Street, Ste. 1300
Chicago, Illinois 60602
Tel: 312-476-7528
Fax: 312-346-8434