# Exhibit 5

FILED DATE: 7/31/2019 4:27 PM   2019L008483

EIN: 27-1778301

### SECOND AMENDED AND RESTATED
### OPERATING AGREEMENT
*of*
### BCL-HOME REHAB LLC

THIS AGREEMENT is made and entered into on January 1, 2017, by the following persons ("Members"):

### BCL-FAMILY LLC
("BCL-Family")

### ELAN PERETZ, NOT INDIVIDUALLY, BUT AS TRUSTEE OF THE ELAN PERETZ TRUST
(the "Peretz Trust")

### DANIEL SHACHTMAN, NOT INDIVIDUALLY, BUT AS TRUSTEE OF THE DANIEL
### SHACHTMAN TRUST DATED OCTOBER 14, 2008
(the "Shachtman Trust")

### KENNETH FIXLER
("Kenneth")

### JONATHON FIXLER
("Jonathon")

### PRELIMINARY STATEMENTS:

A.     The Company was established on January 21, 2010, under and pursuant to the Act, and governed by that certain Operating Agreement (the "Initial Operating Agreement") dated January 21, 2010, by and between Kenneth and BCL-Business Holdings LLC.

B.     The Initial Operating Agreement was amended and restated by that certain Amended and Restated Operating Agreement (the "Amended Operating Agreement") dated October 19, 2012, by Kenneth and BCL-Business Holdings LLC.

C.     As of the date hereof, BCL-Business Holdings LLC has distributed its interest in the Company to the members of BCL-Business Holdings LLC.

D.     The parties hereto are desirous of continuing to operate the Company under the laws of the State.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein and other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged by the parties, the parties agree to amend and restate the Amended Operating Agreement as follows:

### Article 1
### Select Definitions

"Act" means the Limited Liability Company Act from time to time in force in the State.

FILED DATE: 7/31/2019 4:27 PM   2019L008483

"Agreement" means this Second Amended and Restated Operating Agreement, as originally executed and as amended, modified, supplemented or restated from time to time.

"Charter" means the articles of organization, certificate of formation or similar instrument, as amended from time to time, issued by the State evidencing the formation of the Company. The Charter was issued on January 21, 2010, and bears State File No. 03220982.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Company" means the limited liability company formed upon the filing of the Charter and whose affairs are governed by this Agreement.

"Determination Portfolio" means the investment portfolio of the Company (including its subsidiaries, including, without limitation, BCL-Jacksonville LLC, FB Realty, LLC and BCL-Home Lending Parent LLC), as such portfolio existed at 11:59 p.m. Central Standard Time on December 31, 2016.

"First Determination Date" means the date on which the last house in the Determination Portfolio has been sold to a third party.

"Member" means the person or persons identified as such in this Agreement, including persons subsequently admitted to the Company as Members in accordance with Article 10.

"Pay In Amount" means the amount, as calculated by BCL-Family in its reasonable discretion following the First Determination Date, of the net loss from the operation of the Company's business with respect to the Determination Portfolio, *less* the amount the Members contributed to the Company in 2016 in respect of such net loss.

"Profit Percentages" shall be as set forth below and as may be adjusted from time to time in accordance with this Agreement:

| Member | Prior to the First Determination Date | Following the First Determination Date | Following the Second Determination Date |
|---|---|---|---|
| BCL-Family | 56% | 62% | 56% |
| Peretz Trust | 12% | 12% | 12% |
| Shachtman Trust | 12% | 0% | 0% |
| Kenneth | 20% | 20% | 20% |
| Jonathon | 0% | 6% | 12% |

"Second Determination Date" means the date upon which 9.68% of the aggregate amount distributed pursuant to Section 6.2 to BCL-Family following the First Determination Date is equal to 12% of the Pay In Amount.

"State" means the State of Illinois, which has issued the Company's Charter.

FILED DATE: 7/31/2019 4:27 PM   2019L008483

### Article 2
### Organizational Matters

2.1     Formation and Statutory Authority.

(a)     *Formation.*  The Company was formed upon the issuance of the Charter by the State. The Members hereby ratify and adopt the acts and conduct of the Company's organizer in connection with the filing of the Charter as acts and conduct by and on behalf of the Company.  The organizer is hereby released and indemnified by the Company from any liability on account of its actions in connection with the formation of the Company.

(b)     *Statutory Authority.*  The Company shall continue to operate as a limited liability company in accordance with this Agreement and the Act. The rights and obligations of the Members among themselves and in relation to the Company shall be determined in accordance with this Agreement and the Act. To the extent that anything contained in this Agreement conflicts with the Act, or modifies, supplements or otherwise affects any rights or obligations under the Act, this Agreement shall supersede the Act, except to the extent expressly restricted by the Act.

2.2     Filings. The Members shall make such filings and do or cause to be done such other acts and things as shall be required to continue the existence of the Company in the State and shall cause the Company to be qualified or registered under assumed or fictitious names statutes or similar laws in any jurisdiction in which the Company owns property or transacts business to the extent the same is necessary or, in the judgment of the Members, advisable in order to protect the limited liability of the Members or to permit the Company to lawfully own property or transact business. The Members shall, to the extent the same is necessary or, in the judgment of the Members, advisable, execute, file and publish all such certificates, notices, statements or other instruments necessary to permit the Company lawfully to own property and conduct business as a limited liability company in all jurisdictions where the Company elects to own property or transact business and to maintain the limited liability of the Members.

2.3     Principal Office of the Company. The principal office of the Company shall be located at such place within or outside the State as the Members may from time to time designate.  The Company may have secondary offices at such other place or places as the Members may from time to time designate.

2.4     Records to be Maintained. The Company shall at all times during the continuance of the Company keep at the Company's principal office such records and information as the Company may be required to maintain in accordance with the Act.

2.5     Registered Office and Registered Agent. The Members shall designate a registered office and a registered agent in accordance with the Act. The Members have the right to change the Company's registered office and/or registered agent from time to time in accordance with the Act. The Members shall select and designate a registered office and registered agent for the Company in each other state in which the Company is required to maintain or appoint one.

### Article 3
### Purpose of the Company

The purpose of the Company is to engage in any and all lawful businesses, make any and all lawful investments and undertake such other activities related or incidental thereto as the Members may determine is in the interests of the Company.

3

FILED DATE: 7/31/2019 4:27 PM   2019L008483

### Article 4
### Duration of the Company

4.1     Duration of the Company. The Company shall continue in perpetuity unless sooner dissolved in accordance with the other provisions of this Article.

4.2     Winding-Up. The Company shall commence a winding-up of its affairs upon the earliest of:

(a)     *Decision of the Members*. The decision of the Members to do so. A decision of the Members under this paragraph shall require the approval of Members holding at least a majority of the Profit Percentages as of the date such decision is made.

(b)     *Judicial Dissolution*. Upon the entry of a judicial decree of dissolution of the Company in accordance with the Act.

The winding-up of the Company shall be conducted in accordance with this Agreement generally and Article 12 in particular.

4.3     Continuation of Company Upon Certain Events. The death, disability, court declaration of incompetence, bankruptcy, dissolution, liquidation or other dissociation of a Member shall not dissolve the Company, but it shall be continued with the successor or legal representative of such Member; such successor or legal representative shall, to the extent of the interest acquired, be entitled only to the predecessor Member's rights, if any, in the distributions of the Company, and no such person shall have any right to participate in the management of the affairs of the Company or vote on any Company matter without the written consent of the Members holding at least a majority of the Profit Percentages at such time. See Article 10 for additional provisions applicable to any such successor or legal representative.

### Article 5
### Capital Contributions to the Company

5.1     Capital Contributions. Each Member (or its predecessors, if any) has made such contributions to the capital of the Company as are reflected in the books and records of the Company.

5.2     Additional Capital Contributions. Except as set forth in this Agreement or as required by the Act, no Member shall be assessed for additional capital contributions.

(a)     *By Agreement of Members*. The Members may, by unanimous agreement, at any time or from time to time, make additional capital contributions to the Company.

(b)     *By Action of BCL-Family*. If BCL-Family determines that it is necessary or desirable for the Company to obtain additional funds in the form of additional capital contributions, then:

        (i)     BCL-Family shall send to each Member (other than the Shachtman Trust) a notice (the "First Requirement Notice"), which shall advise Members as to the total amount of capital required by the Company (the "Requirement Amount"), the portion of the Requirement Amount which may be contributed by each Member (determined pro rata according to the Members' Profit Percentages at the time such First Requirement Notice is delivered; provided, that if such First Requirement Notice is delivered on or prior to the Second Determination Date, then the portion of the Requirement Amount which may be contributed by each

4

FILED DATE: 7/31/2019 4:27 PM   2019L008483

Member shall be determined pro rata according to the Members' Profit
Percentages as of the day before the Second Determination Date) and the date on
which such capital is required to be contributed to the Company (the
"Requirement Date"). The Requirement Date shall be not less than five days
after the date of the First Requirement Notice.

(ii)     Should any Member not exercise its option and contribute its capital within the
period provided in clause (i), BCL-Family may (but shall not be obligated to)
send to each Member who made contributions pursuant to clause (i) a notice (the
"Second Requirement Notice") of the uncontributed portion of the Requirement
Amount, each of whom may elect to make a further additional capital
contribution to the Company by delivering to BCL-Family, within five days of
the date of the Second Requirement Notice, written notice of the same, which
notice shall include a statement of the maximum amount of the uncontributed
Requirement Amount such Member would be willing to contribute. The portion
of the uncontributed Requirement Amount that may be contributed by each
Member shall be determined by BCL-Family ratably according to the relative
maximum amounts that the Members propose to contribute in their notices to
BCL-Family or otherwise as BCL-Family shall determine, and shall be paid by
the Member to the Company immediately upon demand therefor. No Member,
however, shall be required to pay more than the maximum amount it proposed to
contribute to the Company.

(iii)    *Additional capital contributions under this Section are voluntary*, but once a
Member has agreed to make an additional capital contribution hereunder, the
Company shall have all of the rights and remedies at law, in equity and as set
forth in this Agreement resulting from the failure of the Member to make such
capital contribution.

(iv)     In the event that the entire Requirement Amount is not contributed by all
Members in proportion to their Profit Percentages in effect immediately prior to
the First Requirement Notice, the Profit Percentages of the Members shall be
adjusted with prospective effect to take account of the additional capital
contributions made by the contributing Members in relation to the sum of (A)
those additional capital contributions and (B) in BCL-Family's discretion, either
(i) the aggregate amount of the capital contributions (whether or not returned) of
the Members immediately prior to the additional capital contributions or (ii) the
net fair market value of the Company's assets at such time (as determined by
BCL-Family). Notwithstanding the foregoing, prior to the First Determination
Date, no adjustment shall be made to the Profit Percentage of the Shachtman
Trust.

(c)     *Pay In Amount.*   Upon determination of the Pay In Amount, each Member shall
contribute to the capital of the Company an amount equal to such Member's pro rata portion of the Pay In
Amount (determined in accordance with the Profit Percentages of the Members prior to the First
Determination Date), and the Company shall pay the Pay In Amount to BCL-Operations LLC.

5.3     Guaranty Capital Contributions.     The Members hereby acknowledge that BCL-
Operations LLC ("BCL-Operations") has prior to the date of this Agreement and may subsequent to the
date of this Agreement make loans to the Company. Each of the Members hereby acknowledges that
such Member agreed to reimburse an amount equal to its portion of such loans to the extent that upon the

FILED DATE: 7/31/2019 4:27 PM   2019L008483

conclusion of the activities of the Company, the Company is not able to pay to BCL-Operations all of the outstanding principal and accrued but unpaid interest under such loans, as determined by the Members holding a majority of the Profit Percentages at such time, which amount shall be known herein as the "Guaranteed Amount." To the extent that BCL-Operations is required to pay any amount to another third party in respect of a loan from such other third party to the Company that BCL-Operations guaranteed, such amount shall increase the amount of the Guaranteed Amount accordingly. Upon determination by the Members holding a majority of the Profit Percentages at such time that the activities of the Company have concluded, a final calculation shall be performed by the Company to determine the amount of the Guaranteed Amount. Within 10 days of such determination (or later upon determination by the Members holding a majority of the Profit Percentages at such time), the Members shall contribute to the Company an amount equal to the Guaranteed Amount multiplied by such Member's Profit Percentage, which amounts the Company shall pay to BCL-Operations. For the avoidance of doubt, and notwithstanding the foregoing, the Guaranteed Amount shall not include, and no Member shall be required to contribute pursuant to this Section, any amount in duplication of amounts paid by such Members in respect of the Pay In Amount.

5.4     Defaulting Members.   The Company, acting at the sole direction of BCL-Family, shall be entitled to enforce the obligations of each Member to make the contributions and other payments due to the Company that are provided in this Article and elsewhere in this Agreement, and the Company shall have all remedies available at law or in equity in the event any such contribution or payment is not so made. The Company, acting at the sole direction of BCL-Family, shall be entitled to recover the reasonable attorney's fees and other costs of enforcing the Members' contribution and payment obligations under this Agreement, and shall also be entitled to recover interest on any unpaid amount, from the due date of such payment to the date of payment at 500 basis points over the prime rate of interest from time to time in effect at large US money center banks most recently published in The Wall Street Journal (US Edition) or similar publication if The Wall Street Journal (US Edition) is not available.

### Article 6
### Distributions by the Company

6.1     Definitions.   The following terms shall have the following meanings:

(a)     "*Available Cash*" shall consist of all cash on hand of the Company irrespective of its source, excluding, however, such reserves as Members holding at least a majority of the Profit Percentages as of the date of the determination of such reserves may establish.

(b)     "*Unreturned Capital*" consists of so much of a Member's capital contributions to the Company that have not been returned to such Member by way of distributions made under this Article that are identified (in the distribution provisions of this Article) as distributions of Unreturned Capital. If a person acquires all or a portion of another Member's interest in the Company, the transferee shall succeed to the corresponding proportion of the transferor Member's Unreturned Capital at the time of the transfer.

6.2     Distributions of Available Cash.   Available Cash shall be distributed to the Members in such amounts and at such times as Members holding at least a majority of the Profit Percentages as of the date such distributions are made shall determine in the following rank and order:

(a)     Among the Members in proportion to, and to the extent of, their Unreturned Capital.

(b)     The remainder, if any, among the Members according to their Profit Percentages during the period in which such distributions are made.

FILED DATE: 7/31/2019 4:27 PM   2019L008483

6.3     Priorities.  Except as may be expressly provided in this Agreement, no Member shall have a priority right over any other Member as to distributions.

6.4     Interest on Capital Contributions.  Except as may be expressly provided in this Agreement, no interest shall be allowed to any Member upon the amount of its capital contributions.

6.5     Set-Off Rights.  The Company shall be entitled to set-off against any distributions or other amounts that may be or become due to a Member from the Company any amounts that may be due from such Member to the Company or another Member.

6.6     Restrictions on Distributions.  No distributions may be made to the Members if, after giving effect to such distributions, either the Company would be unable to pay its debts as they become due in the usual course of business or the net assets of the Company would be less than zero.

### Article 7
### Accounting and Tax Matters

7.1     Books of Account.  The Members shall cause proper and true books of account to be maintained for the Company in conformity with sound accounting principles consistently applied.  There shall be recorded in the Company's books of account the particulars of all monies, goods or effects belonging to or owing to or by the Company, or paid, received, sold or purchased in the course of the Company's activities and all of such other transactions, matters and things relating to the Company as are usually entered in books of account kept by companies engaged in activities of a like kind and character.

7.2     Method of Accounting and Fiscal Year.  The Company's books of account shall be maintained on the cash or accrual basis, as determined by Members holding at least a majority of the Profit Percentages as of the date such determination is made.  The Company's fiscal year shall be the calendar year unless determined otherwise by Members holding at least a majority of the Profit Percentages as of the date such determination is made.

7.3     Reports and Returns.  As soon as practicable after the close of each fiscal year the Company shall provide each Member with such statements as shall be necessary to advise the Members properly about their investment in the Company for income tax reporting purposes.  The Company shall engage an accountant to prepare and to see to the filing of all Federal, state and local tax returns on behalf of the Company.  Members acknowledge that the Company may not be able to provide all information required for income tax reporting purposes on a timely basis and that they should expect to extend the time for filing their income tax returns.  Each Member does hereby consent to the electronic furnishing of Schedule K-1 information.

7.4     Capital Accounts.  As part of the Company's books of account, an individual "Capital Account" shall be maintained for each Member at all times in accordance with sound accounting principles consistently applied.

7.5     Financial (Book) Allocations.  The net profit or net loss of the Company, determined on an annual basis in accordance with sound accounting principles, shall, in the discretion of Members holding at least a majority of the Profit Percentages at such time, be allocated among the Members in accordance with any reasonable method selected by such Members that takes due account of the Members' economic interests in the Company and risk of loss as reflected by their capital contributions, rights to distributions and liability (direct and indirect) for the Company's debts and other obligations.

7

FILED DATE: 7/31/2019 4:27 PM   2019L008483

7.6      Tax Allocations. Except as provided herein, or as otherwise required by the Code or Treasury Regulations promulgated thereunder (including, without limitation, Treasury Regulations Section 1.704-1 and 1.704-2), Company income, gain, loss, deduction, credit and other partnership items, as computed for Federal income tax purposes, shall be allocated among the Members in the same manner as the corresponding book items are allocated pursuant to Section 7.5.

7.7      Tax Elections. Members holding at least a majority of the Profit Percentages at any given time shall have the right to make (and revoke) any and all tax elections for the Company, including, without limitation, an election to adjust the tax basis of Company assets under Code Section 754.

7.8      Administration of Tax Proceedings. The Members holding at least a majority of the Profit Percentages at any given time shall appoint, remove and replace the Company's "Tax Matters Partner" as defined in Code Section 6231(a)(7) (referred to herein as the "Tax Matters Member"). The Tax Matters Member shall have the right to resign by giving 30 days written notice to the Members. Upon the resignation of the Tax Matters Member, a successor Tax Matters Member shall be selected by the Members. The Members hereby appoint BCL-Family as the initial Tax Matters Member.

## Article 8
### Management of the Company

8.1      Management by Members. Except as otherwise provided in this Agreement, the affairs of the Company shall be managed and controlled by the Members (other than the Shachtman Trust) in accordance with this Agreement generally and this Article in particular. Except as otherwise provided in this Agreement, any action, decision or exercise of discretion by the Members in the name of the Company shall require the approval of any one of the Members (other than the Shachtman Trust).

8.2      Authority of Members.

(a)      *Power and Authority*. Without limiting the generality of the foregoing, and consistent with the purposes of the Company, each Member (other than the Shachtman Trust) acting alone on behalf of the Company shall have the right, power and authority to acquire assets; purchase goods and services; sell, exchange, lease, license or otherwise deal in or with any and all assets of the Company; open and maintain one or more bank accounts; borrow funds to finance the Company's activities and in connection with such borrowing, mortgage, hypothecate, pledge, lien or otherwise encumber the revenues and assets of the Company; guaranty the debts of affiliates and others when such Member believes it will benefit the Company to do so; confess, settle, compromise or otherwise satisfy debts, claims, judgments and other obligations, including by way of a deed in lieu of foreclosure or similar transaction; enter into any contract or agreement or amend or cancel the same; and invest and reinvest any funds or other assets of the Company – all as incident to or necessary for the operations of the Company.

(b)      *No Duty to Inquire*. Nothing herein contained shall impose any obligation on any person or firm doing business with the Company to inquire as to whether or not a Member has exceeded its power and authority in executing any agreement, contract, lease, mortgage, security agreement, deed or other instrument on behalf of the Company, and any such third person shall be fully protected in relying upon such authority.

(c)      *Major Action Approval Rights*. Notwithstanding any other provisions of this Agreement, a Member shall not be authorized to take, and shall not take, any of the actions that are set out below without the prior written consent of Members holding at least a majority of the Profit Percentages for the period in which such action is taken:

(i)     Making an assignment for the benefit of creditors or admitting in writing the inability of the Company to pay its debts generally as they become due or petitioning or applying to any tribunal for the appointment of a custodian, trustee, receiver or liquidator for the Company or of any substantial part of the assets, or commencing of any proceeding relating to the Company under any bankruptcy, reorganization, arrangement insolvency, readjustment of debt, dissolution or liquidation law of any jurisdiction.

(ii)    Hiring, firing, materially changing the responsibilities or duties, or altering the compensation (including salary, bonus or other benefits) of any employee.

(iii)   Determining the compensation, if any, of any Member or its affiliates in respect of such Member's or its affiliate's services to the Company.

(d)     *Subsidiaries.*   The provisions of this Agreement regarding the management and governance of the Company shall apply as well to the management and governance of the Company's subsidiaries, whether the subsidiaries are managed or controlled directly or indirectly by the Company, as a member, manager, partner, stockholder or otherwise.  Any action to be taken by any such subsidiary shall be construed as an action taken by the Company and shall be subject to the same rights and limitations granted and imposed on the Members under this Agreement.

8.3     Members' Time Commitment.  Each Member shall cause so much time to be devoted to the business of the Company as, in its judgment, the conduct of the Company's business shall reasonably require.

8.4     Reimbursement of Members.  The Company shall reimburse the Members for any costs that may be properly expended on behalf of the Company made out of funds other than those of the Company.

8.5     Related Business Partners.  The Company may employ, contract for services with, acquire or sell goods, property and materials from or to, borrow money from and otherwise deal with any Member or any affiliate of a Member on any basis which is customary and competitive, or otherwise fair and reasonable.

8.6     Liability of Member.  A Member shall not be liable to another Member or the Company for honest mistakes of judgment, or for action or inaction, taken reasonably and in good faith for a purpose that was reasonably believed to be in the best interests of the Company, or for losses due to such mistakes, action or inaction, or for the negligence, dishonesty or bad faith of any employee, broker or other agent of the Company, but only if such employee, broker or agent was selected, engaged or retained and supervised with reasonable care.  The Members may consult with counsel and accountants in respect of Company affairs and be fully protected and justified in any action or inaction that is taken in accordance with the advice or opinion of such counsel or accountants if, and only if, they shall have been selected with reasonable care.  The Members shall look solely to the assets of the Company for the return of their capital and, if the assets of the Company remaining after payment or discharge of the debts and liabilities of the Company are insufficient to return such capital, they shall have no recourse against the Members for such purpose.  Notwithstanding any of the foregoing to the contrary, the provisions of this Section shall not be construed to relieve (or attempt to relieve) any person of any liability by reason of gross negligence, recklessness or intentional wrongdoing or to the extent (but only to the extent) that such liability may not be waived, modified or limited under applicable law, but shall be construed so as to effectuate the provisions of this Section to the fullest extent permitted by law.  This Section shall also

FILED DATE: 7/31/2019 4:27 PM   2019L008483

FILED DATE: 7/31/2019 4:27 PM   2019L008483

apply to the officers, directors, shareholders, partners, members, managers, employees, trustees, agents and other representatives of any entity that is a Member.

8.7    Indemnification. The Company shall indemnify any person who was or is a party, or is threatened to be made a party, to any threatened, pending or completed action, suit or proceeding (other than an action by or in the right of the Company), whether civil, criminal, administrative or investigative, by reason of the fact that the person is or was a member, manager, officer, employee, agent or other representative of the Company, or is or was serving at the request of the Company as a director, manager, officer, employee or agent of another limited liability company, corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorney's fees and costs), judgments, fines and amounts paid in settlement actually and reasonably incurred by the person in connection with the action, suit or proceeding, if the person acted in good faith and in a manner the person reasonably believed to be in, or not opposed to, the best interests of the Company or, with respect to any criminal action or proceeding, had no reasonable cause to believe the person's conduct was unlawful. The termination of any action, suit or proceeding by judgment, order, settlement, conviction or upon a plea of *nolo contendere* or its equivalent shall not, of itself, create a presumption that the person did not act in good faith and in a manner that the person reasonably believed to be in, or not opposed to, the best interests of the Company or, with respect to any criminal action or proceeding, that the person had reasonable cause to believe that the person's conduct was unlawful. This Section shall also apply to the officers, directors, shareholders, partners, members, managers, employees, trustees, agents and other representatives of any entity that is a Member.

8.8    Authorized Signatories and Officers of the Company. The Members holding a majority of the Profit Percentages at any given time may from time to time appoint one or more persons to act as authorized signatories to execute agreements, contracts, documents (including promissory notes, mortgages, security agreements and other loan documents) and other instruments (including deeds) on behalf of the Company. The Members holding a majority of the Profit Percentages at any given time may also from time to time appoint one or more persons to serve as officers of the Company, in such capacities and with such delegated rights and powers as the Members may approve. No such authorized signatory or officer shall have any different or greater rights and powers than the Members have under this Agreement. Authorized signatories and officers appointed by the Members shall be entitled to be indemnified by the Company in accordance with Section 8.7.

## Article 9
## Membership in the Company

9.1    Rights and Obligations of the Members. Unless admitted to the Company as a Member in accordance with Article 10, no person who is not a signatory to this Agreement shall be considered a Member. The Company need deal only with persons as Members that are so admitted and shall not be required to deal with any other person (other than with respect to distributions to assignees pursuant to assignments in compliance with Article 10) merely because of an assignment or transfer of an interest to such person or by reason of the incapacity of a Member. Any distribution made in accordance with this Agreement by the Company to the person shown on the Company records as a Member or to its legal representatives, or to the assignee of the right to receive Company distributions as provided herein, shall acquit the Company with respect to such distribution of all liability to any other person that may have an interest in or claim to such distribution by reason of any other assignment by the Member with respect to such distribution or by reason of such Member's incapacity, or for any other reason.

9.2    Liability. No Member shall be personally liable for any of the debts of the Company or any of the losses thereof beyond the amount contributed or required to be contributed by it to the Company under this Agreement and as otherwise specified in this Agreement or in the Act.

9.3     No Partition. No Member shall have the right to partition any property of the Company during the term of this Agreement, or while such assets are held in trust pursuant to Section 12.4, nor shall any Member make application to any court of authority having jurisdiction in the matter or commence or prosecute any action or proceeding for such partition and the sale thereof, and upon any breach of the provisions of this Section by any Member, the other Members, in addition to all of the rights and remedies in law and in equity that they may have, shall be entitled to a decree or order restraining and enjoining such application, action or proceeding. To the extent not prohibited by law, the Shachtman Trust specifically renounces, waives and forfeits all rights, whether arising under contract or statute or by operation of law, to seek, bring or maintain any action in any court of law or equity for an accounting.

9.4     Withdrawals and Resignations. No Member shall be entitled to withdraw, resign or voluntarily dissociate from the Company, except pursuant to the terms of this Agreement. No Member shall be entitled to receive any money or property from the Company except (a) by way of distributions as provided pursuant to Article 6, (b) by way of distributions upon the winding-up of the Company pursuant to Article 12, (c) in respect of any loans to the Company then due and owing to such Member and (d) as expressly provided elsewhere in this Agreement.

9.5     Uncertificated or Certificated Securities. Unless the Members decide otherwise, the interests of the Members in the Company shall not be certificated.

9.6     Trustee Liability.

(a)     *Actions as Trustees.* When this Agreement is executed by the trustee of any trust, such execution is by the trustee, not individually, but solely as trustee in the exercise and under the power of authority conferred upon and vested in such trustee, and nothing herein contained shall be construed as creating any liability on the part of any such trustee personally to pay any amounts required to be paid hereunder, or to perform any covenant, either express or implied, contained herein, all such liability, if any, being expressly waived by the parties hereto by their execution hereof. Any liability of any Member which is a trust to the Company or to any third person shall be only that of such trust to the full extent of its trust estate and shall not be a personal liability of any trustee, grantor or beneficiary thereof.

(b)     *Successor Trustee.* Any successor trustee or trustees of any trust which is a Member herein shall be entitled to exercise the same rights and privileges and be subject to the same duties and obligations as its predecessor trustee. As used in this Agreement, the term "trustee" shall include any or all such successor trustees.

(c)     *Termination of Trust.* The termination of any trust which is a Member shall not terminate the Company. Upon the allocation or distribution of all or any portion of the Company interest of a trust which is a Member pursuant to the exercise of any power of appointment, or otherwise, to a beneficiary of such trust or to another person or persons or to another trust or trusts, whether or not such distribution shall terminate such distributing trust, each such distributee shall be entitled to be admitted to the Company as a Member to the extent of the proportionate share of the Company interest distributed to it, subject to the terms of this Agreement, including, without limitation, the restrictions contained in Article 10.

9.7     Right of Reimbursement. In the event any Member guarantees any indebtedness or other obligation of the Company, then the Company shall promptly reimburse the guarantor for any and all payments made by the guarantor for such indebtedness or other obligation. The Company shall not be obligated to reimburse the guarantor for any obligation under the guaranty that arises by reason of the gross negligence, willful misconduct or fraud of the guarantor or its affiliate. This Section shall also

FILED DATE: 7/31/2019 4:27 PM   2019L008483

11

FILED DATE: 7/31/2019 4:27 PM   2019L008483

apply to any guaranty of any indebtedness or other obligation of the Company given by, and this Section shall then so benefit, any affiliate of a Member.

9.8     Competitive Undertakings. Any Member may engage in business ventures of any nature and description independently or with others, and neither the Company nor any of the Members shall have any rights in or to such independent ventures or the income or profits derived therefrom.

Article 10
Transfers and Rights Offerings; Bring-Along Rights; Purchase of Interests

10.1    Transfers by Members. No Member shall sell, exchange, pledge, mortgage, hypothecate or otherwise transfer or encumber its interest in the Company without the prior written consent of Members holding at least a majority of the Profit Percentages at such time. Any such transfer or encumbrance shall be void from inception and of no force or effect whatsoever. Direct or indirect transfers of interests in entities that are Members shall also be subject to the limitations of this Section.

10.2    Additional Membership Interests.   The Members may issue additional membership interests in the Company (including so-called carried interests), or options, warrants or other rights to acquire membership interests in the Company, to new or existing Members on such terms as Members holding at least a majority of the Profit Percentages at  any given time may determine is fair and reasonable. Upon the issuance of additional membership interests to new or existing Members, Members holding at least a majority of the Profit Percentages at such time are authorized to adjust the Profit Percentages, Capital Account balances, Unreturned Capital balances and other attributes of the membership interests of the existing Members to take due account of the additional membership interests issued by the Company.

10.3    General Provisions. The following rules shall apply to transfers of Company interests and the admission of additional persons to the Company:

(a)     *Procedure for Admission*. No person shall be admitted as a transferee or additional Member hereunder unless and until  (i) in the case of an assignment of an interest in the Company permitted hereby, the assignment is made in writing, signed by the assignor and accepted in writing by the assignee, and a duplicate original of the assignment is delivered to and accepted by the Company, and (ii) the prospective admittee executes and delivers to the Company a written agreement, in form and substance satisfactory to the Company, pursuant to which said person agrees to be bound by this Agreement.

(b)     *Binding Effect*. Any person acquiring or claiming an interest in the Company, in any manner whatsoever, shall be subject to and bound by all terms, conditions and obligations of this Agreement to which its predecessor in interest, if any, was subject or bound, without regard to whether such person has executed a counterpart hereof or any other document contemplated hereby. No person, including the legal representatives, heirs or legatees of a deceased Member, shall have any rights or obligations greater than those set forth herein and no person shall acquire an interest in the Company or become a Member except as permitted hereby.

(c)     *Actions Prior to Acceptance of Assignment*. Notwithstanding that a person acquiring or claiming an interest in the Company is bound by all terms, conditions and obligations of this Agreement to which its predecessor in interest, if any, was subject or bound, the Company shall be entitled to treat the assignor of the assigned interest as the absolute owner thereof in all respects and shall incur no liability for distributions made in good faith to such assignor prior to such time as the documents specified in this Section have been delivered to and accepted by the Company. Any person to whom an

interest in the Company is attempted to be transferred in violation of this Article or any other provision of
this Agreement shall not have any of the rights of a Member of the Company otherwise provided under
this Agreement or the Act, including, but not limited to, the right (i) to receive distributions from the
Company, (ii) to vote on any matter, (iii) to participate in the management of the Company, (iv) to act as
an agent of the Company, (v) to obtain any information or accounting of the affairs of the Company or
(vi) to inspect the books or records of the Company. If, however, by law, the Company is required to
recognize the purported transfer of a Member's interest in the Company, the purported transferee's rights
shall be strictly an economic interest in the Company limited solely to distributions (and accompanying
allocations of accounting and tax items) as provided by this Agreement with respect to such economic
interest, and the Member whose interest in the Company has purportedly been transferred shall have no
right to any distributions with respect to such interest in the Company. Any distributions to such
purported transferee may be applied (without limiting any other legal or equitable rights of the Company)
to satisfy any debts, obligations or liabilities that the transferor or transferee may have to the Company
(including for damages). A Member attempting to engage in any purported transfer that has not been
approved in writing by Members holding at least a majority of the Profit Percentages shall be liable to
indemnify and hold harmless the Company and the other Members from all costs, liability and damages
that they may incur (including, but not limited to, incremental tax liability and attorney's fees and
expenses) as a result of such purported transfer; any purported transferee shall be jointly and severally
liable to do the same, including by way of set-off as provided in Section 6.5. For purposes of this
paragraph, an economic interest in the Company shall mean a person's rights to distributions (and
accompanying accounting and tax allocations), but excluding the right to vote, approve or disapprove, or
otherwise to participate in, the management and control of the affairs of the Company.

(d)     *Costs.*  The costs incurred by the Company in processing an assignment (including
attorney's fees and costs) shall be borne by the assignee, and shall be payable prior to and as a condition
of admission to the Company.

10.4     Bring-Along Rights.  In the event that BCL-Family proposes to enter into one or more
agreements to sell to any person or persons (referred to herein collectively as the "purchaser") all or
substantially all of the membership interests in the Company in a single transaction or related series of
transactions in lieu of a sale of all or a substantial part of the assets of the Company, all of the Members
hereby agree to sell their respective interests in the Company to the purchaser on the terms set forth in
such agreements. The agreements shall provide for the payment to the Members for their interests in the
Company amounts equal to the amounts that they would have received had the Company (a) sold all of its
assets at the price implicit in the price to be paid by the purchaser for the membership interests in the
Company, (b) satisfied all of its obligations and (c) made liquidating distributions to the Members in
accordance with Article 16. The costs associated with the sale shall, in general, be borne by the Members
in the same proportion as they shared the considerations received in accordance with the preceding
sentence. BCL-Family may reallocate among the Members so much of the considerations that a Member
would be entitled to receive as equals the amounts which such Member then owes to the Company or to
another Member. BCL-Family is hereby granted by each Member a power of attorney, coupled with an
interest, to execute in the name of the Member any and all agreements, contracts, documents and other
instruments (including instruments of assignment) that BCL-Family deems necessary or useful in order to
consummate these transactions. These instruments shall be deemed to have been executed on behalf of
the Members as if signed by the Members themselves.

10.5     Purchase of Interests.

(a)     *Membership Interests Subject to Purchase.*  The interests of any Member in the Company
(which for purposes of this Section shall include any other person possessing an economic interest in the
Company) shall be subject to purchase by BCL-Family as provided in this Section.

FILED DATE: 7/31/2019 4:27 PM   2019L008483

     (b)    *Election to Purchase Made by BCL-Family.* The decision to purchase a Member's interest in the Company in accordance with this Section shall be made by BCL-Family in its sole discretion and for any reason, including, without limitation, for "Cause" (as defined herein):

          (i)    As used in this Section, "Cause" means:

               (A)    A material breach by the Member of any of the terms, conditions or obligations of the Member contained in (1) this Agreement, including, without limitation, transferring (voluntarily, by operation of law or otherwise) an interest in the Company without the requisite approval of the Members in accordance with Section 10.1, or (2) any other operating agreement or governing document with respect to the Company.

               (B)    Fraud, dishonesty or willful and serious misconduct by the Member with respect to the business or affairs of the Company.

               (C)    Fraud, dishonesty or serious misconduct by the Member, other than with respect to the business or affairs of the Company, which involves an act of moral turpitude or could adversely affect the business, affairs or reputation of the Company.

               (D)    Interference with the orderly conduct of the Company's affairs that is demonstrably and materially injurious to the Company, monetarily or otherwise.

               (E)    The Member becoming a disreputable person.

               (F)    A Member who is an employee or otherwise engaged to provide services to the Company (in each case, an "employee") is separated from service for good cause (as defined below). As used in this clause, "good cause" with respect to an employee means any one or more of the following:

                    (I)    Employee's material breach of any employment, services or restrictive covenant agreement between employee and the Company.

                    (II)    Employee's continued failure to perform his duties and responsibilities to the Company in a competent and professional manner for a period of 10 days following written notice by the Company to employee of such failure.

                    (III)    Employee's willful failure to adhere to the Company's codes, policies or procedures (as in effect or as amended from time to time).

                    (IV)    Employee's breach of any statutory or common law fiduciary duty (including the duty of loyalty) to the Company.

                    (V)    Employee's admission or conviction of, or plea of guilt or *nolo contendere* with respect to, a felony crime or any other crime involving moral turpitude.

FILED DATE: 7/31/2019 4:27 PM   2019L008483

   (VI)  Employee's abuse of illegal drugs or other controlled substances or his habitual intoxication.

   (VII) Any act described in the other clauses of this clause (i).

   For the avoidance of doubt, "good cause" with respect to any employee does not mean retiring (in accordance with the retirement policies of the Company) or voluntarily resigning from service to the Company at a time when the Company would not otherwise have the right to terminate employee for good cause.

 (ii)  For purposes of clauses (i) and (ii), the term "Company" shall include the Company and any of its subsidiaries or other affiliates. For the avoidance of doubt, any entity owned directly or indirectly by Joel Barnett, Nancy Barnett, Sam Barnett, Lindsey Barnett or any of their respective relatives or any trusts established for the benefit of any of the foregoing shall be deemed affiliates of the Company.

 (iii)  For purposes of clauses (i) and (ii), the term "Member" shall include the Member and any of his or its affiliates or family members. For illustrative purposes only, Elan Peretz, Daniel Shachtman, their respective spouses and any trust established for the benefit of their respective spouses shall be deemed "Members" for purposes of clauses (i) and (ii).

 (iv)  The purchase of a Member's interest for Cause shall not be considered a remedy for breach and shall not limit or in any way diminish any right or remedy the Company may have on account of an act constituting Cause.

 (v)  The interests of all transferees, successors or assignees of a Member also be subject to purchase under this Section if any transferee, successor or assignee has engaged in any of the acts described in clauses (i) or (ii), or if the assigning or another predecessor Member of the transferee, successor or assignee (whether or not a Member) engaged in any of the acts described in such clauses.

 (c)  *Purchase Notice.*  If BCL-Family decides to purchase a Member's interest in the Company in accordance with this Section, BCL-Family shall send such Member (the "Subject Member") written notice (the "Purchased Notice") of its decision. The Purchase Notice shall specify the date on which the purchase sha ll close (the "Purchase Clo sing Date"); the Purchase Closi ng Date shall be established in accordance with paragraph (f).

 (d)  *Purchase Price.*  The purchase price (the "Purchase Price") of a Subject Member's interest shall equal:

   (i)  The amount that the Subject Member would have received had the Company (A) terminated on the date the Purchase Notice was given, (B) sold all of its assets at their fair market values (as determined by BCL-Family in its sole discretion) on the date the Purchase Notice was given (net of BCL-Family's estimate of the costs and expenses of such sale), (C) satisfied all of its debts and obligations and (D) made distributions to the Members in accordance with Section 12.2, *less* any distributions made to the Subject Member after the date the Purchase Notice is given to Purchase Closing Date, *multiplied by*

FILED DATE: 7/31/2019 4:27 PM   2019L008483

        (ii)     a percentage discount determined by BCL-Family in its sole discretion based on a decrease in value by reason of minority discount, lack of marketability or similar theory and such other factors determined by BCL-Family in its sole discretion.

Notwithstanding anything to the contrary contained in this Agreement, in the case of a purchase for Cause, (I) the Purchase Price shall not exceed $100.00 and (II) the Purchase Price shall be reduced by all of the Company's costs and expenses associated with the redemption, including without limitation attorney's and other professional fees, filing fees and transfer taxes.

        (e)     *Payment of Purchase Price*. The Purchase Price shall be paid in immediately available funds on the Purchase Closing Date.

        (f)     *Purchase Closing Date and Closing Deliveries*. The Purchase Closing Date shall be on a date and at the time specified by BCL-Family in the Purchase Notice but not later than the 30th day following the date the Purchase Notice is given. Closing shall occur at the Company's principal office or at such other place specified by BCL-Family in the Purchase Notice. At the closing, the Company shall tender the Purchase Price (as provided in paragraph (e)) to the Subject Member and the Subject Member shall accept the same and execute such documents of transfer as BCL-Family may request. If the Subject Member shall not accept the tender of the Purchase Price or execute said documents, BCL-Family shall be entitled to execute the documents of transfer for and on behalf of the Subject Member, with the same effect as if the Subject Member had done so itself, and the contemplated transfer shall be deemed closed once Management has deposited the Purchase Price (i) as an interpleader in any court of competent jurisdiction (the Subject Member hereby irrevocably consents to such interpleader) or (ii) with any bank, trust company, escrow company or law firm under instructions that the same may be withdrawn by the Subject Member upon demand. The closing of a redemption as contemplated in this paragraph shall not prejudice a Subject Member's right to contest the calculation of the Purchase Price but a Subject Member shall not be permitted to contest the effectiveness of the closing as contemplated by this paragraph.

        (g)     *Assignment of Right of Purchase*. BCL-Family shall have the right to assign BCL-Family's right to acquire the Subject Member's interest in the Company to any one or more Members or affiliates of any of the foregoing, and the provisions of this Section shall be construed accordingly.

### Article 11
### Amendments to the Agreement

      11.1    Amendments.

        (a)     *In General*. This Agreement may be modified or amended at any time and from time to time upon the written consent of BCL-Family.

        (b)     *Limitations on Authority to Amend*. In no event shall any modification or amendment to this Agreement made pursuant to clause (a) above (i) disproportionately decrease the right of any Member to distributions in relation to Members similarly situated; or (ii) cause any Member to incur any additional personal liability with respect to the Company – unless in each case the Members adversely affected thereby consent in writing to such modification or amendment.

      11.2    Power of Attorney. Each Member hereby appoints BCL-Family (and each of its managers) as its true and lawful attorney, coupled with an interest in its name, place and stead, to sign, execute, acknowledge, swear to and file any and all documents which in the discretion of such attorney are required to be signed, executed, acknowledged, sworn to or filed by the Member to discharge the

FILED DATE: 7/31/2019 4:27 PM   2019L008483

purposes of the Company as hereinabove stated or the provisions of this Agreement. Without limitation, among the documents BCL-Family (and each of its managers) may execute on behalf of each Member shall be the following:

(a)    Any amendments to this Agreement, when this Agreement is amended in accordance with Section 11.1.

(b)    The Charter and any other instrument which may be required of the Company pursuant to the Act or the laws of any other jurisdiction and any amendments thereto that are not prohibited by Section 11.1.

The grant of authority set forth in this Section is a special power of attorney coupled with an interest, is irrevocable and shall survive the death, incapacity, insolvency, bankruptcy, liquidation or dissolution of a Member; may be exercised by BCL-Family (or any of its managers) for a Member by a facsimile signature or by listing the names of all of the Members executing any instrument with the signature of BCL-Family (or any of its managers), as attorney in fact for all of them; and shall survive the delivery of an assignment by a Member of all or any portion of its interest, except that where the assignee has been approved for admission to the Company as a substituted Member by the requisite consent of the Members in accordance with the provisions of Article 10, the power of attorney shall survive the delivery of such assignment for the sole purpose of enabling BCL-Family (and each of its managers) to execute, acknowledge and file any instrument necessary to effect such substitution, and the grant of authority set forth in this Section shall be deemed to have been made by such substitute Member.

Article 12
Winding-Up and Dissolution of the Company

12.1    Winding-Up and Dissolution Procedures.  Upon an event described in Section 4.2, the affairs of the Company shall be wound-up and the Company shall be dissolved.  A Member (the "Winding-Up Member") appointed by Members holding at least a majority of the Profit Percentages shall preside over the winding-up and dissolution of the Company or may appoint one or more agents to do so. The Winding-Up Member shall make such filings in the State and in such other states in which the activities of the Company make it necessary or desirable to do so and do or cause to be done such other acts and things as shall be required to dissolve the Company.

12.2    Distributions Upon Winding-Up.  Except as otherwise provided in this Article, the winding-up and dissolution of the Company shall involve:

(a)    The orderly sale or other disposition of the Company's non-cash assets within a commercially reasonable time.

(b)    The payment or settlement of (and where appropriate, the establishment of reasonable reserves for) the Company's debts and other obligations, including to Members who are creditors, in the order of priority and to the extent provided by law.

(c)    The distribution of any remaining sums among the Members in accordance with Section 6.2.

12.3    Distributions In Kind.  In the event that the Winding-Up Member determines that it is necessary or desirable to make a distribution of Company assets in kind, such assets shall be transferred and conveyed either to (a) the Members as tenants in common so as to vest in them undivided interests in the whole of such assets in proportion to their respective rights to share in the proceeds of the sale of such

FILED DATE: 7/31/2019 4:27 PM   2019L008483

assets in accordance with the provisions of Section 12.2(c); or (b) any one or more of the Members either as tenants in common (so as to vest in them undivided interests in the whole of such assets, in the proportions reasonably determined by the Winding-Up Member) or otherwise, on the condition that each such distributee receives aggregate value (whether in kind, cash or both) in accordance with the provisions of Section 12.2(c). All such Company assets shall be valued at fair market value as determined by the Winding-Up Member and shall be subject to such reasonable conditions and restrictions as are necessary or desirable in order to preserve the value of the assets distributed or for legal reasons.

12.4    Liquidating Trust. In the discretion of the Winding-Up Member, all or any portion of the distributions that would otherwise be made to the Members pursuant to Section 12.2(c) may be distributed to a trust established for the benefit of the Members for the purposes of liquidating Company assets, collecting amounts owed to the Company and paying any debts or other obligations of the Company arising out of or in connection with the Company. The Winding-Up Member shall appoint one or more persons as liquidating trustee. The assets of any such trust shall be distributed to the Members from time to time in the discretion of the Liquidating Trustee in the same proportions as the amount distributed to such trust by the Company would otherwise have been distributed to the Members pursuant to this Agreement.

12.5    Final Accounting. As part of the winding-up of the Company, a final accounting shall be made of the activities of the Company from the date of the last previous accounting to the date of dissolution. If a Member has a deficit in its Capital Account, such Member shall not be obligated to contribute any amount of that deficit to the Company; any such deficit shall not be considered an asset of the Company.

### Article 13
### General Provisions

13.1    Notices. All notices, demands, offers or other communications required or permitted to be given pursuant to this Agreement shall be in writing and shall be transmitted by courier, recognized overnight delivery service (such as FedEx) or first class (postage prepaid) certified U.S. mail. Any notice, demand, offer or other communication shall be effective on the date of receipt at the address of the addressee. Notices, demands, offers or other communications to a Member shall be addressed to the Member at the address beneath the Member's name on the signature page of this Agreement or, if applicable, in such Member's joinder to this Agreement or other instrument admitting the Member to the Company. Any Member may change its address for all future notices, demands, offers or other communications by giving notice to all of the other Members stating its new address.

13.2    Successors. This Agreement and all the terms and provisions hereof shall be binding upon the parties hereto and their respective legal representatives, heirs, successors and assigns, except as expressly herein otherwise provided.

13.3    Third Party Benefits. Without limiting Section 13.2, the provisions of this Agreement are intended solely to benefit the Company and the parties hereto and, to the fullest extent permitted by applicable law, shall not be construed as conferring any benefit upon any other person, including without limitation any creditor of the Company (and no such creditor or other person shall be a third party beneficiary of this Agreement), and except as required by the Act, the Members shall have no duty or obligation to any such creditor or other person to make any contributions or return any money or other property to the Company.

FILED DATE: 7/31/2019 4:27 PM   2019L008483

13.4    Governing Law.  This Agreement shall be construed in conformity with the domestic laws of the State, as applied to agreements whose only parties are residents of the State and which are to be performed entirely within the State.

13.5    Severability.  If any provision of this Agreement, or the application of such provision to any person or circumstance, shall be held invalid by a court of competent jurisdiction, the remainder of this Agreement, or the application of such provision to persons or circumstances other than those to which it is held invalid by such court, shall not be affected thereby.

13.6    Other Rules of Construction.  Every provision of this Agreement shall be construed simply according to its fair meaning and not strictly for or against any Member (notwithstanding any rule of law requiring an Agreement to be construed against the drafting party).  The following additional rules of construction shall apply to this Agreement:

(a)    All pronouns shall include the masculine, feminine or neuter thereof, wherever the context and facts require such construction.

(b)    The term "person" refers to an individual, corporation, partnership, joint venture, limited liability company, limited liability partnership, a cell of a series organization, association, joint stock company, statutory trust, common-law trust, unincorporated organization, government authority or any other organization whether or not a legal entity.

(c)    The term "party" means a signatory to this Agreement, including a Member and any successor to any Member, whether or not such successor has executed or otherwise joined in this Agreement.  The fact that a successor is a party shall not give that person any greater rights than it has under the express terms of this Agreement.  By way of illustration, a successor who has not been admitted to the Company in accordance with Article 10 is a party to this Agreement for purposes of the dispute resolution procedures in Section 13.8, but despite being a party is still subject to the limitations of Section 10.3(c).

(d)    The term "affiliate" is to have a meaning reasonably appropriate to its context; without limiting the generality of the foregoing, when used in connection with conduct that by the terms of this Agreement is to be circumscribed, the term shall be interpreted broadly.  Without limiting the generality of the foregoing, an "affiliate" of a specified person, or a person "affiliated" with a specified person, is a person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with the specified person.

(e)    All terms defined in this Agreement in the singular have the same meanings when used in the plural and vice versa.

(f)    The use of the word "including" herein shall not be considered to limit the provisions which it modifies but instead shall mean "including without limitation" u nless the provision states otherwise.

(g)    An "Article" of this Agreement is typically identified with a number (*e.g.*, "Article 13").  A "Section" of this Agreement corresponds to an Article and is typically identified with a number that includes a decimal (*e.g.*, "Section 13.6").  A "paragraph" of this Agreement corresponds to a Section and is typically identified by a lower case letter (*e.g.*, paragraph "(g)").  A "clause" of this Agreement corresponds to a paragraph and is typically identified with a roman numeral or an upper case letter (*e.g.*, "(i)," "(I)" or "(A)").

FILED DATE: 7/31/2019 4:27 PM   2019L008483

(h)     Headings, titles and subtitles are inserted for convenience of reference only and are to be ignored in any construction of the provisions hereof.

(i)     In the interpretation of this Agreement, no inference shall be drawn from the fact that a provision not included in this Agreement was included and then deleted from a draft of this Agreement.

13.7    Members Not Agents. Nothing contained herein shall be construed to constitute any Member the agent of another Member, except as specifically provided herein.

13.8    Dispute Resolution.

(a)     *Jurisdiction, Venue and Service of Process.* The Company and the parties to this Agreement hereby irrevocably and unconditionally agree that any suit, action or proceeding arising out of or related to this Agreement or the Company shall be brought only in the United States District Court for the Northern District of Illinois or in the Circuit Court of Cook County, Chicago, Illinois, and the specific choice from among the foregoing shall be determined by the party initiating such suit, action or proceeding. To the fullest extent permissible by law, the Company and the parties to this Agreement hereby consent to the personal jurisdiction, venue and forum of such courts and hereby irrevocably and unconditionally waive any claim or objection that it is not subject to the jurisdiction of such courts, that the venue is improper, that the forum is inconvenient or any similar objection, claim or argument. Service of process on any of the parties hereto with regard to any such action may be made and is considered legally proper by mailing the process to such person by certified mail to the address of such person as provided in Section 13.1 or to any subsequent address to which notices shall be sent.

(b)     *Waiver of Trial by Jury.* Each party acknowledges and agrees that any controversy which may arise under this Agreement is likely to involve complicated and difficult issues, and therefore each such party hereby irrevocably and unconditionally waives any right such party may have to a trial by jury with respect to any litigation directly or indirectly arising out of or relating to this Agreement. Each party understands and has considered the implications of this waiver. Each party makes this waiver voluntarily.

(c)     *Attorney's Fees.* If the Company or any Member obtains a judgment in connection with a dispute arising under or in connection with any this Agreement, such party shall be entitled to recover from the non-prevailing party its court costs, and reasonable attorney's fees and disbursements incurred in connection therewith and in any appeal or enforcement proceeding thereafter, in addition to all other recoverable costs.

13.9    Remedies. Subject to any express provisions of this Agreement, no remedy conferred upon the Company or any Member is intended to be exclusive of any other remedy herein or by law provided or permitted, but each shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law, in equity or by statute.

13.10   Waiver. No waiver by the Company or any Member of any breach of this Agreement shall be deemed to be a waiver of any other breach of any kind or nature, and no acceptance of payment or performance by the Company or any Member after any such breach shall be deemed to be a waiver of any breach of this Agreement, whether or not the Company or any Member knows of such breach at the time it accepts such payment or performance. No failure or delay on the part of the Company or any Member to exercise any right it may have shall prevent the exercise thereof by the Company or any Member at any time such other may continue to be so in default, and no such failure or delay shall operate as a waiver of any default.

FILED DATE: 7/31/2019 4:27 PM   2019L008483

13.11   Entire Understanding.   This Agreement constitutes the entire understanding among the Members and supersedes any prior understanding and/or written or oral agreements among them with respect to the Company.   In the event of any conflict between this Agreement and any other written or oral communications among the Members, this Agreement shall control and take precedence.

13.12   Further Assurances.   Each of the parties hereto shall hereafter execute and deliver such further instruments and do such further acts and things as may be required or useful to carry out the intent and purpose of this Agreement and as are not inconsistent with the terms hereof.

13.13   Counterparts.   This Agreement may be executed in counterparts, each of which shall be an original, but all of which shall constitute one and the same instrument.

13.14   Electronic Transmission.   Signatures to this Agreement that are transmitted electronically (*i.e.*, via e-mail or facsimile) shall be binding.

13.15   Counsel.   Joel Barnett and BCL-Family (collectively, the "Directing Party") have selected Levenfeld Pearlstein, LLC ("LP") to prepare this Agreement.   LP is counsel to Directing Party. Each party to this Agreement acknowledges that LP (a) does not represent the interests of any party other than Directing Party and (b) that LP shall owe no duties to the Company or any other party other than Directing Party. In the event any dispute or controversy arises between the Company or a party, on the one hand, and Directing Party, on the other hand, each party agrees that LP may represent Directing Party in any such dispute or controversy.   To the extent that Directing Party requests that LP do so, LP may represent the Company in any dispute with any party other than Directing Party.   The Company and each party consent to such representation.   Each party further acknowledges that, whether or not LP has in the past represented or is currently representing such party with respect to other matters, LP has not represented the interest of any party other than Directing Party in the preparation or negotiation of this Agreement.

*[Signatures begin on the next page]*

21

*[Signature Page to Second Amended and Restated Operating Agreement]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed.

BCL-FAMILY LLC

By: _____
    Joel A. Barnett, Manager

450 Skokie Boulevard
Suite 604
Northbrook, Illinois  60062

_____
Elan Peretz, not individually, but as
Trustee of the Elan Peretz Trust

450 Skokie Boulevard
Suite 604
Northbrook, Illinois  60062

_____
Daniel Shachtman, not individually,
but as Trustee of the Daniel
Shachtman Trust Dated October 14,
2008

450 Skokie Boulevard
Suite 604
Northbrook, Illinois  60062

_____
Kenneth Fixler

450 Skokie Boulevard
Suite 604
Northbrook, Illinois  60062

_____
Jonathon Fixler

450 Skokie Boulevard
Suite 604
Northbrook, Illinois  60062

FILED DATE: 7/31/2019 4:27 PM   2019L008483